Joseph WEIDER and Mr. America Publishing Co., Inc., Plaintiffs,

v.

Robert C. HOFFMAN, also known as Bob Hoffman, individually and trading as Strength and Health Publishing Co., and York Barbell Company, Inc., Defendants.

Civ. No. 6593.

United States District Court
M. D. Pennsylvania.

Feb. 4, 1965.

As Amended Feb. 11, 1965.

438

Harold Tull, Harrisburg, Pa., George J. Ivins, Philadelphia, Pa., for plaintiffs.

J. Richard Budding, Budding & Yost, York, Pa., H. Joseph Hepford, Harrisburg, Pa., for defendants.

SHERIDAN, Chief Judge.

These are motions by plaintiffs for a new trial on a verdict for defendants in a libel action, and by plaintiffs, defendants in the counterclaim, for judgment n. o. v. or for a new trial [1] on a verdict in favor of one of the defendants, Robert C. Hoffman, on his counterclaim for conspiracy.

Jurisdiction is based on diversity of citizenship and the amount involved. Pennsylvania law is applicable.[2]

Plaintiff, Joseph Weider, and defendant, Robert C. Hoffman, are each engaged in various enterprises dealing with physical culture and weight lifting. Hoffman owns 98 percent of the stock of defendant, York Barbell Company, Inc., a manufacturer of weight lifting and physical culture apparatus and supplies, which in turn owns defendant, Strength and Health Co. This publishing company publishes Strength & Health, a physical culture magazine which disseminates information concerning the weight lifting and physical culture field, and which advertises the products of defendant, York Barbell Company, and York Athletic Supply Company, not a party to this suit.

Plaintiff, Joseph Weider, disseminates information concerning his interests through various magazines, one of which is Mr. America, published by plaintiff, Mr. America Publishing Co., Inc. Another is Muscle Builder, a magazine published by companies controlled by Weider.

Plaintiffs' amended complaint, in four "counts," charged defendants with maliciously and libelously publishing certain statements in the June, September and November, 1958, issues of Strength & Health. The June, 1958 issue contained an editorial by Hoffman, "Birds of a Feather". In describing "birds of a feather which flock together," rats were described as associating with rats,

skunks with skunks, jackals with jackals, and hyenas with hyenas. Referring to Weider, the editorial said: "In our own wonderful sport, we have a small Hitler, a small Stalin, one who is a master of all the despicable tactics imaginable." The editorial requests those who favor Weider to "flock" to Weider, and those who favor Hoffman to "flock" to Hoffman. It states that "Experience has proved that the Big Lie technique does not sell magazines. Weider knows that people will read his magazines to see what new (or usually time-worn and oft repeated) diatribe he has to offer." Weider is referred to as being money mad with a desire only to make money for himself. Readers are requested not to buy the Weider controlled magazines.

In the September, 1958 issue, in the letters-to-the-editor column, were letters commenting on the above editorial. These include statements such as " * * I would not wipe my nose on Weedy's rag * * *," " * * * I'm glad you finally did something about Weider.", "It might interest you to know that the character you mentioned in your editorial only gets talked about in our gym as an object for ridicule or as the butt of a joke.", and "Until I read your article, I felt as though I was the only one that considered Weider one of Hitler's gang."

In the November, 1958 issue, an article "Pal Joey," contains an exaggerated account of Weider's muscular prowess, and derisive reference (according to plaintiff) to Weider's interest in the physical culture line for physical culture sake and not for the sake of money, with a background of Weider as the king in a medieval castle surrounded by subjects and serfs.

Defendants denied the allegations of malicious libel and pleaded as affirmative defenses, truth, privilege or fair comment, consent, and other defenses which need not be detailed.

1. In their briefs, plaintiffs request that the court dismiss the counterclaim, rather than award a new trial, as an alternative to their motion for judgment n.o.v.

2. Both sides tried the action on the basis of Pennsylvania law and the evidence tended to show that the first act of publication occurred in Pennsylvania.

Defendant, Hoffman, also filed various counterclaims, including counts for the violation of the invasion of right of privacy, and for the monopolization of the physical culture business. These were abandoned during the trial. Two conspiracy counts remained. In the first, Hoffman alleged that through honesty and fairness he had built up a national and international reputation as a weight lifting and body building coach, instructor, writer and publisher, equipment manufacturer and health advisor, and that plaintiffs unlawfully and maliciously conspired and agreed to injure Hoffman in these endeavors, interests, enterprises and business, and to deprive him of his customers, readers and students, to defame his character by holding him up to contempt, and to subject him to great loss. The second is similar in that it dealt with a conspiracy by plaintiffs to injure Hoffman in his business and endeavors, but it is more specific in that it charged that the object of the conspiracy was to induce persons to cease contractual relationships with Hoffman, to discourage others from entering into business relationships with him, and to destroy the good will of his business. During the trial both counts were combined and treated as one count for a conspiracy to injure Hoffman in his business, reputation and endeavors.

The bases of the conspiracy were articles published in certain issues of Muscle Builder and Mr. America magazines.

In the February, 1957 issue of Muscle Builder, an open letter to the chairman of the A.A.U. weight lifting committee by a weight lifter accused Hoffman of "rigging" an A.A.U. sanctioned weight lifting contest and demanded that action be taken against Hoffman.

In the December, 1957 issue of Muscle Builder, an article, "People Who live in Glass Houses," attributed to Hoffman a charge that four popular physique magazines, two of which—Adonis and Body Beautiful—are controlled by Weider, pander to homosexuals through publication of nude and semi-nude photographs of body builders. The article then states that many body builders, including Hoffman and others who work for Hoffman, have so posed, and that for many years the Hoffman controlled magazine published such pictures. The article is illustrated with uncomplimentary cartoon-type drawings and photographs of Hoffman.

In the January, 1958 issue of Mr. America, an article, "Bob Hoffman's Strange Finances," accuses Hoffman of building up an image of philanthropy in his support of weight lifting, while doing so only for the purpose of making money. The article refers to details of an action against Hoffman for additional taxes, based on various money-making schemes. which Hoffman allegedly was able to put over under the guise of philanthropy in supporting the weight lifting sport and the A.A.U.'s participation therein. This article is also illustrated with an uncomplimentary cartoon-type drawing. The evidence showed that Weider directed the artist to depict Hoffman stealing money from the United States, and "Uncle Sam" mad at Hoffman throwing the money around to women of ill repute who are wearing mink coats, driving cars, and serving drinks to drunks. Weider directed the artist to show Hoffman "with bald head in shirtless sleves (sic), pot overlaping (sic) belt," stating that Hoffman is the great American benefactor because he spent all his money being such. The artist substantially complied with these instructions.

In the February, 1958 issue of Mr. America, in an article, "Portrait Of A 'Medicine Man'," accompanied by an apparent editorial, "Exposing Bob Hoffman, No. 2 of A Series" and "Give It To Us Straight," there are similar attacks on Hoffman's philanthropy, the income tax action is mentioned, Hoffman is described as a bully, the Hoffman products are ridiculed, and a large part of the article is devoted to Hoffman's alleged preoccupation with sex. This article is also illustrated by uncomplimentary cartoon-type drawings.

In the March, 1958 issue of Mr. America, in an article, "The Hoffman Exposé"

—"Hoffman's Calculated Scheme to Ruin Bodybuilding," Hoffman is described as one who "fixes" the results of body building contests to degrade those who are interested primarily in body building, rather than weight lifting, who do not use Hoffman's products or subscribe to his magazine, and who lean toward the products of Hoffman's competitors. The object of this, it is stated, is to destroy body building in favor of weight lifting.

In the libel action, the jury returned a verdict in favor of the defendants. In the conspiracy counterclaim the jury awarded Hoffman "$30,000 Punitive damages" against both Weider and Mr. America Publishing Co., Inc.

Plaintiffs assigned many reasons in support of their motion for a new trial in the libel action. In their brief and argument, however, they press only the reasons that the court erred in failing to properly instruct the jury on the law of libel *per se*, that the court erred in failing to grant plaintiffs' motion for a mistrial, and that the verdict was the result of passion and prejudice.

Plaintiffs contend that the words "* * * rat * * * it is debased, filthy * * *," "skunks," "jackals and hyenas * * * they eat carrion * *," "* * * small Hitler, a small Stalin * * *" are libelous *per se*, and argue that while the court in its instructions "skirted" the definition of "libel *per se*," it failed "to apply specific language which would indicate that such a legal proposition is in fact an element of the law." They take exception to the refusal of the court to charge their request for instruction number 2.

> "2. Defendants Robert C. Hoffman and York Barbell Co., Inc. did publish and cause to be disseminated words such as skunk, hyena, rat and jackal, used to describe the plaintiffs, which on their face are clearly defamatory, must injure the reputation of the plaintiffs and are actionable without proof that any particular damage has followed from their use."

The substance of plaintiffs' request was covered in the court's charge. The court instructed the jury that such words on their face were capable of a libelous meaning. This was in accordance with the Restatement, Torts, § 614 (1) which has been cited with approval by the Pennsylvania Supreme Court as defining the function of the court in libel cases, such as here, where "the words are defamatory on their face." Cosgrove Studio & Camera Shop, Inc. v. Pane, 1962, 408 Pa. 314, 182 A.2d 751. Cf. Volomino v. Messenger Publishing Co., 1963, 410 Pa. 611, 189 A.2d 873, Bogash v. Elkins, 1962, 405 Pa. 437, 176 A.2d 677. The jury then was instructed that whether the words did in fact convey a libelous meaning to persons to whom they were communicated was for the jury to determine. This was in accordance with Restatement, Torts, § 614 (2), which defines the function of the jury. Bocchicchio v. Curtis Publishing Co., E.D.Pa.1962, 203 F.Supp. 403, Bausewine v. Norristown Herald, Inc., 1945, 351 Pa. 634, 643, 41 A.2d 736. The function of the jury in determining whether a communication, capable of a defamatory meaning, was so understood by its recipient, would be a finding with respect to a plaintiff's burden of proof as set forth in 12 P.S. § 1584a(1) (d, e), which appears to be an adoption of the Restatement, Torts, § 613. In this connection it should be noted that the article "Birds of a Feather" did not directly refer to plaintiff, Weider, as a "rat" or "jackal" or some of the other terms about which complaint was made.

The jury was instructed that in connection with words capable of a libelous meaning on their face, if the jury found that plaintiffs were libeled under the principles given them, they could make an award of compensatory damages for the harm to the reputation that naturally results from a libel. These would include general damages to plaintiffs' reputation, standing, and the like. The considerations in arriving at an award of general damages were detailed. The

circumstances under which nominal damages could be awarded were explained.

█ The jury was also instructed that a plaintiff need prove special, or as plaintiffs would have it, particular damage, only where the words are libelous by innuendo, and this instruction related only to the article "Pal Joey" wherein the words such as rat and skunk were not used. The basis for an award of punitive damages was also explained.

█ Thus, the instructions given of the meaning and effect of words libelous of themselves were more complete and accurate than those asked for in plaintiffs' request for instruction number 2. To instruct a jury that words are "actionable without proof that any particular damage has followed from their use" is incomplete since the manner in which they are actionable and the damages which the jury may assess, must be set forth.

█ At the conclusion of the charge the court indicated that all requests not specifically read were refused, as those that would have been affirmed were covered in the general charge. If counsel thought that the charge was not adequate, it was their duty to point out any inadequacy and to record their objections to the ruling of the court. Counsel did record objections to some other parts of the charge, but not to the charge on libel *per se*. Failure to properly object to the giving or failure to give an instruction may not now be assigned as error. Rule 51, Fed.R.Civ.P.; Mazer v. Lipschutz, 3 Cir. 1964, 327 F.2d 42, 51.

The contentions that the court erred in failing to grant plaintiffs' motion for a mistrial, and that the verdict on the counterclaim was the result of passion and prejudice are based substantially on testimony by witnesses for the defendants concerning the homosexual aspects of certain magazines published by Weider. The proffered purpose for this line of questioning was to show the truth of the statement in "Birds of a Feather" that Weider through his magazines "was a master of all the despicable tactics imaginable," "All this character to whom we are referring really cares about is making money." and " * * * Weider is money mad. His only desire is to make money for himself." Plaintiffs argue that the testimony was inflammatory, and that the statements were an expression of opinion and, therefore, the testimony was irrelevant because an opinion is not subject to the defense of truth. Defendants answer that truth is a proper defense to opinion, and also that the testimony was admissible in support of privilege, and relevant to the question of injury to Weider's reputation which defendants say was bad.

Under the Restatement of Torts truth is a defense to a statement of opinion [3]

3. Pertinent sections of the Restatement of Torts are:
"§ 566 Expressions of Opinion Upon Known or Assumed Facts.
"A defamatory communication may consist of a statement of opinion based upon facts known or assumed by both parties to the communication."
Comment *a* of § 566: "The truth or falsity of an accusation of reprehensible conduct is a matter of fact, provable as such. The propriety of the opinion, as fair comment thereon, is a matter of judgment. * * *"
"§ 567 Expressions of Opinion Upon Undisclosed Facts.
"A defamatory communication may consist of a statement of opinion upon undisclosed facts."

Comment *a* of § 567: "In order that the communication may be defamatory it is not necessary that it specifically charge the other with particular reprehensible acts or omissions. The defamation may consist of words which, while couched in the form of epithets or adjectives carry an implied accusation that the other has been guilty of some specific type of reprehensible conduct. * * * As to the effect upon the proof of truth as a justification of the fact that the defamation consists of a statement of opinion which implies the commission of an unidentified offense, as distinguished from an accusation of a specific offense, see § 582, b."
Comment *b* of § 582: " * * * if the charge is of persistent misconduct, proof of a single instance thereof is not

whether the supporting facts are known or undisclosed. Relevant to this is the evidence that in the Mr. America issue of December, 1957, six months before the publication of "Birds of a Feather," Hoffman was attacked for his statement that Adonis and Body Beautiful magazines "pandered to homosexuals." Testimony to show that plaintiffs published magazines intended for homosexuals is evidence from which a jury could find facts which would justify the characterization of Weider.

 The testimony on homosexuality was not inflammatory. The first time it arose was in cross-examination of Weider who testified that Body Beautiful was not a magazine for homosexuals, nor was it so designed and printed. The witness, Horvath, testified that he heard statements by Mr. Weider that Adonis magazine would be well received by homosexuals, and that Body Beautiful magazine as well as Adonis were intended solely for a homosexual audience. It would be a strange result if a plaintiff in a libel action could successfully object to proof of his own conduct, offered as part of the defense of truth, on the ground it was so despicable as to prejudice people against him. The right of the defendants to present such evidence far outweighed any possible prejudice to plaintiffs. The magazines Adonis, Body

Beautiful, Gem, and others, containing nude and semi-nude poses of males and females, were excluded as exhibits. Plaintiffs were fully protected and have no complaint.

 In their brief plaintiffs made several misstatements. They complain that the court failed to rule on their motions for mistrial, that defendants' counsel ignored the court's warning not to refer to homosexuality, and that as a result the record became confused and that prejudicial testimony got before the jury. Counsel did not object to the testimony of Weider that Body Beautiful was not a magazine for homosexuals until after the court called the parties to side bar and raised the question. Counsel was never told not to refer to the subject. Defendants advised that the purpose of the testimony was to show truth, and promised that a witness would be produced to testify that Weider directed that the magazine appeal to homosexuals. Subsequently, defendants offered a witness, Van Cleef, to show that Weider intended Body Beautiful for homosexuals. The court ruled that such testimony was relevant to the truth of the statements of "despicable tactics" and "money mad," overruled defendants' objection to all such testimony and told plaintiffs that they could move to strike if the testimony did not meet the offer.[4] Van Cleef did

---

enough unless the instance is such as to imply its repetition. Thus, the truth of a charge that a woman is a prostitute is not proved by proof of a single act of unchastity. On the other hand, a statement may be a characterization of the person about whom it is made which expresses the maker's unfavorable judgment upon undisclosed conduct of the other. In such a case the maker must show the existence of facts which justify the terms in which he has described the person of whom he spoke * * *."

4. Tr. pp. 169–170.
 "By the Court:
 "We are here in Chambers and I am saying to Mr. Hepford that I am going to permit the line of questioning which he proposed in the latter part of his offer with respect to this witness, Mr. Van Cleef, namely, that he offered to prove

that he had conversations with Weider about Body Beautiful for homosecuals— about printing a book tended to appeal to homosexuals. We are going to permit that—not affecting the credibility of Weider in response to a question not objected to that the magazine Body Beautiful was not printed for the benefit of homosexuals. I am not permitting this line of testimony to affect the credibility of Mr. Weider. If that was the only purpose of it, I think the arguments against it would outweigh the arguments in favor of it. I am permitting it because you say it is part of your defense of truth, particularly the exhibit attached to the Complaint, Exhibit 'A', Page 4.
 "By Mr. Hepford:
 "Yes, Your Honor.
 "By the Court:

 "If it answers the charge in there that Mr. Weider is despicable and did stoop

not testify in accordance with the offer, but the plaintiffs did not move to strike. A similar offer was made when Horvath took the stand. Plaintiffs' objection was overruled, and at the same time the court specifically denied all previous motions for a mistrial. Horvath's testimony was in accordance with the offer and properly admitted. The record shows that not once, but several times, after full discussion at side bar and in chambers, the court clearly overruled plaintiffs' objections to this line of testimony, and denied their motions for a mistrial. Any confusion, as plaintiffs would have it, is theirs.

Plaintiffs' motion for a new trial on their libel claim will be denied. It is unnecessary to decide whether the action was barred by the statute of limitations.[5]

On the motion for judgment n. o. v. on Hoffman's verdict in the counterclaim, plaintiffs' principal argument is that the verdict cannot stand because it was for punitive damages only.

In their verdict the jury directed that Weider and Mr. America Publishing Co., Inc. pay Hoffman "the sum of $30,000 Punitive damages." After the verdict was read by the Clerk and affirmed by the jury, the following took place.

"By the Court:

"Members of the Jury: Do I understand your verdict to be that in the conspiracy case you find only punitive damages? Is that right?

"By the Foreman:

"That is right, Your Honor."

In view of the written verdict, and the jury's answer to the court's inquiry, it is clear that no compensatory damages were awarded. Hoffman points to nothing which would indicate differently.

This raises the question whether under Pennsylvania law there may be a recovery of punitive damages when the jury found there were no actual damages. The jury was instructed that general compensatory damages could be awarded for any injury to Hoffman in his endeavors and in his position with the A.A.U. There was evidence that Hoffman was excluded from certain A.A.U. committees after the publication of plaintiffs' articles because, while those in control retained respect for Hoffman,. they feared that outsiders would get an unfavorable impression of the A.A.U.; and that, while friends of Hoffman maintained confidence in him, the casual observer was confused by the articles. The jury was instructed that damages should not be assessed for injury to Hoffman's business because there was no evidence to support such an award. Hoffman testified his business improved after the attacks by Weider. There was no evidence that Hoffman would have earned more money had it not been for the Weider attacks. The jury was also instructed that punitive damages must bear a reasonable relationship to compensatory damages, and not to award damages for conduct which was not malicious, wanton, reckless or oppressive. Hoffman did not object to these instructions.

██ ██ Pennsylvania law has two requirements—there can not be a recovery of punitive damages unless there is a showing of actual damages, and if

to despicable tactics, and would be an answer to the charge he is money mad, it is relevant. If it isn't an answer to that, we are off base.
"By Mr. Ivins:
"Yes.
"In order to save a great deal of time, can I enter a general objection to all such testimony as may be given by Mr. Van Cleef? I object.
"By the Court:
"You make your objection now and it is overruled. At the conclusion of Mr. Van

Cleef's testimony, if you want to, you can move to strike.
"By Mr. Ivins:
"Very good, sir."

5. In an answer to an interrogatory the jury found that the article "Birds of a Feather" was first distributed to persons other than the plaintiffs prior to April 13, 1958. Since the action was started on April 13, 1959, defendants raised the bar of the Pennsylvania one year statute of limitations. 12 P.S. §§ 31 and 32.

punitive damages are recovered, they must bear a reasonable relationship to actual damages. Basista v. Walter Weir, 3 Cir. 1965, 340 F.2d 74, filed January 8, 1965. The court quoted the following from Hilbert v. Roth, 1959, 395 Pa. 270, 276, 149 A.2d 648, 652.

" 'It is well recognized that no award for punitive damages may be made where actual damage has not been suffered. * * * The right to punitive damages is a mere incident to a cause of action—an element which the jury may consider in making its determination—and not the subject [matter] of the action in itself.' "

In Hilbert the plaintiff was precluded from pursuing his claim for compensatory damages against one tortfeasor because he satisfied a judgment against another joint tortfeasor. In so holding, the Supreme Court of Pennsylvania cited Benson v. Pennsylvania R. Co., 1918, 66 Pitts.L.J. 347, 350, in which authority was cited for the proposition that actual damages must be found as a predicate for the recovery of punitive damages since "When no actual damage has been sustained as found by the jury in this case at bar, no exemplary damages can be allowed. * * *." Hoffman argues that punitive damages can be recovered if the evidence shows actual damages have been suffered, even though there has not been an award. This is contrary to Hilbert, which cannot be distinguished because the plaintiff's claim for compensatory damages was barred. The award of actual damages, and not the showing of actual damages, determines whether a verdict for punitive damages will stand. Mitchell v. Randal, 1927, 288 Pa. 518, 137 A. 171.

Hoffman cites several Pennsylvania cases. Knoll v. Woodring, 1919, 16 North. 371, is a lower court case which is contrary to Hilbert v. Roth, supra. Greeney v. Pennsylvania Water Co., 1905, 29 Pa.Super. 136, does not support Hoffman's argument. "All that is required is that he make a case by his pleading and evidence which will entitle him to exemplary damages, for the wrong inflicted, *in addition* to those actually sustained." (Emphasis supplied.) In Adelman v. Rosenbaum, 1938, 133 Pa. Super. 386, 3 A.2d 15, there was a lump sum verdict with no indication what part was allocable to actual damages, and the court stated:

"We think it fairly may be assumed that a small portion of the $500 verdict in this case represented actual damages. The jury probably did not intend to disregard the fact that plaintiffs had to employ a lawyer, the time spent in trying to get the matter adjusted, etc. In any event, there was no violation of the rule that punitive damages may not be wholly disproportionate to the actual damages."

In the Greeney case there was also a verdict which did not specify whether the damages were actual or punitive. These cases present situations quite different from the instant case where the jury clearly indicated that punitive damages alone were awarded.

Hoffman also cites Wallace v. Jameson, 1897, 179 Pa. 98, 36 A. 142, an action alleging libel by imputation of bribery as authority for the proposition that a verdict of money damages may stand although the plaintiff neither proved nor asked for actual damages. Hoffman fails to distinguish between "actual" and "special" damages. "Actual" damages are synonymous with compensatory damages. Compensatory damages are either "general" or "special". 25 C.J.S. Damages § 2. In this case it was contended that a publication was not libelous *per se*, and since "special" damages were not pleaded or proved, a nonsuit should have been entered. In approving a lump sum verdict for $2,500, the court held that the publication was libelous *per se*, and that the submission to the jury of the question whether the publication was libelous *per se* was an instruction which favored defendants. General damages, one form of actual damages, were sufficient to support the verdict. The case lends no sup-

port to Hoffman. It is in accordance with the charge in the instant case that the jury may find general damages arising out of words libelous *per se,* but that special damages must be shown for words libelous by innuendo. See Cosgrove Studio & Camera Shop, Inc. v. Pane, supra. Bogash v. Elkins, supra. Here, there was not a lump sum verdict, and the jury specifically awarded punitive damages only, the effect of which is a finding of no other type of damages.

Other principles point to the conclusion that Pennsylvania law requires a finding and award, as distinguished from a mere showing, of actual damage to support an award of punitive damages. Punitive damages must bear a reasonable relationship to the amount of actual damages. Givens v. W. J. Gilmore Drug Co., 1940, 337 Pa. 278, 10 A.2d 12; Hughes v. Babcock, 1944, 349 Pa. 475, 37 A.2d 551; Suflas v. Cleveland Wrecking Co., E.D.Pa.1963, 218 F.Supp. 289. In the absence of a finding and award of actual damages, there is no basis by which the reasonableness of a punitive award can be measured. The holding of Mitchell v. Randal, 1927, 288 Pa. 518, 137 A. 171, supra, is that a finding and an award of actual damages, rather than evidence thereof, is required:

> " * * * Under the evidence of the case at bar the punitive damages were entirely disproportionate to the compensatory damages awarded. The learned trial judge evidently entertained the same view, but felt constrained to sustain the verdict upon the theory that the testimony was sufficient to warrant a finding that the plaintiff had been actually damaged in an amount much larger than the jury found. We cannot regard this as a sufficient reason for approving an award of punitive damages so disproportionate to the amount of compensatory damages allowed."

Even if an award of punitive damages could stand absent an award of actual damages, the award here does not bear a reasonable relationship to the evidence of actual damages taking into account not merely the act itself, but all the surrounding circumstances, including the motives of the wrongdoer. Hughes v. Babcock, supra. Hoffman admitted his business increased, and there was almost a total failure by plaintiffs to achieve the objects of the conspiracy. Hoffman had a publication with which to fight back, and he did with apparent success. The evidence of actual damage was scant.

■ The verdict for punitive damages cannot stand. Rule 50(b) of the Federal Rules of Civil Procedure provides that upon a motion for judgment in accordance with a motion for a directed verdict, " * * * If a verdict was returned the court may allow the judgment to stand or may reopen the judgment and either order a new trial or direct the entry of judgment as if the requested verdict had been directed." In determining whether judgment n. o. v. should be awarded, the court may consider "only the question of law as to whether when all the evidence is considered, together with all reasonable inferences which may be drawn therefrom most favorably to the plaintiff, there is a total failure or lack of evidence to prove any necessary element of the plaintiff's case." Morris Brothers Lumber Co. v. Eakin, 3 Cir. 1959, 262 F.2d 259.

■ In the case of the ordinary verdict the evidence in support of the liability and damage portions of the case must be viewed to determine whether the verdict should stand. Hoffman's award of $30,000 punitive damages presents an unusual problem because since actual damages were not awarded, the award of punitive damages presents a legal and not an evidentiary question. On a motion for a judgment notwithstanding the verdict, if the court believes such judgment would be justified, the court has discretion instead to grant a new trial if it believes that any defect in proof might be remedied on a second trial, or if needed evidence was ruled out by some error of the court. 2B Barron and Holtzoff, Federal Practice and Procedure, § 1079, at p. 417. There is no

indication here that there is any defect in proof which could be remedied, or that needed evidence was excluded, which would cause a jury to find actual damages. Also, in the apparent belief that the jury's verdict was legally permissible, defendants have not filed a motion for a new trial.

 Under the circumstances, plaintiffs should not be awarded judgment n. o. v. The jury's verdict indicates that a right of Hoffman's has been invaded. In the absence of proof of "real, special, or other compensatory items of damages. * * * [Hoffman's] recovery for the * * * interference with [his] right * * * must be limited to a vindication by an award of nominal damages. * * * Nominal damages represent the award of a trifling sum where there has been a breach of duty or infraction or invasion of a right, but no real, substantial or serious loss or injury has been established." Stevenson v. Economy Bank of Ambridge, 1964, 413 Pa. 442, 197 A.2d 721. In R & B Electric Co. v. Leventry, 1931, 102 Pa.Super. 353, 156 A. 581, the court pointed out that even where the evidence would have sustained either a finding that damages had, or had not been, suffered, and the jury found that a right of plaintiff had been invaded, but that no damages were suffered, since the legal wrong had been established, plaintiff was entitled to nominal damages.

In their brief plaintiffs point to 7 P.L.E. Conspiracy, § 1, at p. 138, that "Unless actual damage has resulted from something done by one or more of the conspirators in furtherance of the object of the conspiracy, no civil action lies against anyone for conspiracy. * * *" The cases cited in support of this statement do not support the fact that "damage" as distinguished from "injury" must be shown before a civil action for conspiracy will lie. Most of the cases involved a tort which could have been committed either by one person or by several with the result that if the conspiracy or combination had not been proved, but one person had committed

the tort, there would be recovery against that person. In Rundell v. Kalbfus, 1889, 125 Pa. 123, 17 A. 238, there was no mention of a showing of actual "damage" as a basis for a cause of action. The court stated that in a civil case the "mere combination injures no one, and, unless there is something done in pursuance thereof I apprehend no action [will] lie." That "something" does not refer to the need for actual damages, but rather to the need for an overt act which would inflict a legal "injury," and not necessarily actual damage.

The concept of a legal "injury" as opposed to "damage" as a basis for a conspiracy action is borne out by the language of more recent Pennsylvania cases. In Helmig v. Rockwell Mfg. Co., 1957, 389 Pa. 21, at p. 35, 131 A.2d 622, at p. 625, it is stated, "A conspiracy is actionable only when it produces an overt act which injures the complaining party * * *" and in Vant v. Gish, 1963, 412 Pa. 359, at pp. 365–366, 194 A.2d 522, at p. 526, citing, as plaintiffs did, 7 P.L.E. § 1, " * * * a conspiracy is actionable only when there is injury to the complainant * * *". Injury is the violation of a legal right. Keogh v. Chicago & N.W. Ry. Co., 1922, 260 U.S. 156, 163, 43 S.Ct. 47, 67 L.Ed. 183; Duggan v. Baltimore & O. R.R., 1893, 159 Pa. 248, 28 A. 182, 186. Stevenson v. Economy Bank of Ambridge, supra. Damage is that which flows from such violation. There was sufficient evidence from which the jury could infer existence of a conspiracy, and overt acts pursuant thereto which resulted in a violation of Hoffman's right not to be injured in his reputation, avocation, and calling. Aside from the above cited cases which require a showing of injury, not damage, to sustain an action for conspiracy, there is no reason in a tort action such as this to deprive a suitor of vindication for the violation of his right through an award of nominal damages. See Stevenson v. Economy Bank of Ambridge, supra.

At oral argument plaintiffs abandoned their alternate motion for a new trial on the counterclaim.

The motions of plaintiffs for a new trial and for judgment n. o. v. will be denied. The judgment in favor of Hoffman will be vacated with direction that judgment be entered in favor of Hoffman and against Joseph Weider and Mr. America Publishing Co., Inc. for $1.00 nominal damages. Stevenson v. Economy Bank of Ambridge, supra.