[No. 43944. En Banc. September 30, 1976.]

STEPHANIE RASOR, *Respondent*, v. RETAIL CREDIT COMPANY, *Appellant*.

*Witherspoon, Kelley, Davenport & Toole,* by *E. Glenn Harmon,* for appellant.

*Layman, Mullin & Etter,* by *John G. Layman* and *Frank J. Gebhardt,* for respondent.

UTTER, J.—This court accepted certification by the Court of Appeals to review a jury verdict and judgment in favor of plaintiff Rasor in her suit alleging violations of the Fair Credit Reporting Act, 15 U.S.C. § 1681 *et seq.* (1970), by defendant Retail Credit Company.[1] Defendant's assignments of error raise questions involving the scope of the act and the elements of damages recoverable under the act. In support of other assignments of error, defendant argues that the trial court erred in certain of its rulings on the admissibility of evidence and in certain of its instructions to the jury. Defendant also asserts that alleged misconduct

---

[1] At oral argument, counsel informed this court that since the time of trial appellant's corporate name has changed to Equifax, Inc.

by the jury and by plaintiff's counsel require reversal. We find no error and affirm the judgment entered below.

At the time of trial, respondent Rasor was a 53-year-old resident of Sandpoint, Idaho, a community of approximately 5,000 persons. There she operated two businesses, including a motel. In the fall of 1972, respondent applied for health insurance with Bankers Life and Casualty Company, with which she had other health insurance policies. The prospective insurer requested appellant Retail Credit Company to prepare a consumer credit report on respondent. On November 7, 1972, a field representative employed in appellant's Spokane, Washington office, traveled to Sandpoint to conduct an investigation of respondent and 10 other persons. Appellant's employee made the 11 investigations in 4 hours or less one afternoon and spoke with a total of three persons, two partners in a service station and the manager of another service station, in the preparation of his report on respondent. Based on information from these sources, appellant's report, prepared on November 8, stated in part, "[respondent] has had a reputation of living with more than one man out of wedlock in the past" and "[h]er reputation has suffered because of out of wedlock living arrangements in the recent past." The document also commented on respondent's drinking habits and concluded this "[i]nformation was carefully confirmed by several long-time residents, in this area, who are businessmen and neighbors." Although identified on its face as a "HEALTH REPORT", the report contained only two items dealing directly with respondent's health. The questions "Do [sic] you learn of any illness, operation, or injury, past or present?" and "Did you learn of any member of applicant's family (blood relation) having had heart trouble, cancer, diabetes, tuberculosis or mental trouble?" were both answered "No."

On November 14, respondent applied for a Small Business Administration loan to complete the addition of units to her motel. Approval of the loan was conditioned upon the acquisition of life insurance by respondent to serve as

security for the loan. Accordingly, respondent applied through a local agent for a policy from Guardian Life Insurance Company. The local insurance agent gave written notice to respondent that "a routine report may be obtained which will provide applicable information concerning character, general reputation, personal characteristics and mode of living", *see* section 1681d, and the prospective insurer requested from appellant an investigative report on respondent. Appellant made no new investigation of respondent and mailed a copy of the November 8 report obtained for health insurance purposes to the insurance company. Following receipt of the report, Guardian Life declined to issue a policy to respondent "due to extensive criticism from inspection which must remain confidential."

After notification from Guardian Life that she could inquire about the report which influenced its decision at appellant's Spokane office, *see* section 1681m(a), respondent traveled to Spokane on December 20, 1972. She was not allowed to read the report but was informed of its contents, *see* section 1681g(a), which she found "shocking." With permission from respondent, appellant's employee informed respondent's insurance agent of the substance of the report. The agent then applied for the insurance required to obtain the Small Business Administration loan from two other insurers who offered to issue a policy, but only at a higher premium rate.

On January 9, 1973, respondent made a second trip to appellant's Spokane office and there stated several specific objections to information contained in the November 8 report. As a result, on January 11, an employee of appellant performed a reinvestigation of respondent, *see* section 1681i(a), contacting 10 residents of Sandpoint during the course of an almost daylong inquiry. A second report, based on the reinvestigation, stated in part:

> Your applicant has been married and divorced three times and is presently divorced. She has a boyfriend and stated that they each have their own homes and businesses and do not live together, although she admitted he stays overnight occasionally if he is too tired to go home.

Sources state that both maintain their own living quarters but are known to stay with each other overnight on an occasional basis. There is no current criticism of this living arrangement.

The new report was sent to the three insurers which had received the November 8 report, with notice that the second report "supplant[s] any previous information we have reported," *see* section 1681i(d). On February 26, Guardian Life notified the local agent that respondent's case was being reopened in light of the new report. In April 1973, respondent received the policy requested but at an additional premium, calculated by the local agent to be $16.66 per $1,000 of coverage.

Respondent commenced this suit in March 1973 in Superior Court. *See* 15 U.S.C. § 1681p; *Ruth v. Westinghouse Credit Co.*, 373 F. Supp. 468, 469 (W.D. Okla. 1974). After 5 days of trial, the court granted appellant's motion to strike respondent's claims for invasion of privacy and libel. The court instructed the jury that if it found the first credit report prepared on November 8 substantially true, the verdict should be for appellant. Alternately, if the jury found the report substantially false, the verdict should be for appellant if it had followed "reasonable procedures" to assure compliance with the Fair Credit Reporting Act. A verdict in favor of respondent for $5,000 was returned.

I

The Fair Credit Reporting Act was adopted "to protect an individual from inaccurate or arbitrary information about himself in a consumer report that is being used as a factor in determining the individual's eligibility for credit, insurance or employment." *Porter v. Talbot Perkins Children's Servs.*, 355 F. Supp. 174, 176 (S.D.N.Y. 1973). This important federal program for the protection of consumers was a Congressional response to documented abuses in the previously self-regulated credit reporting industry. *See, e.g., Hearings on Commercial Credit Bureaus Before a Subcomm. on Invasion of Privacy of the House Comm. on Government Operations*, 90th Cong., 2d Sess. (1968); *Hear-*

*ing on Retail Credit Co. of Atlanta, Ga., Before a Subcomm. on Invasion of Privacy of the House Comm. on Government Operations*, 90th Cong., 2d Sess. (1968); *Hearings on S. 823 Before the Subcomm. on Financial Institutions of the Senate Comm. on Banking and Currency*, 91st Cong., 1st Sess. (1969); *Hearings on H.R. 16340 Before a Subcomm. on Consumer Affairs of the House Comm. on Banking and Currency*, 91st Cong., 1st Sess. (1969). The members of the industry trade association and the two largest credit reporting corporations possess a total of over 180 million files on American citizens. *Hearings on S. 2360 Before the Subcomm. on Consumer Credit of the Senate Comm. on Banking, Housing and Urban Affairs*, 93d Cong., 1st Sess. 19-20, 61, 126 (1973). As Senator Proxmire, the chief sponsor of the act, stated in presenting the fair credit reporting legislation to the Senate, "[f]ew individuals realize that these credit files are in existence. However, such a file can have a very serious effect on whether a man [or woman] gets employment or insurance. It can have a disastrous effect, as our hearings show it has had a disastrous effect, on some individuals." 115 Cong. Rec. 33408-09 (1969). To compensate victims for the harm which may flow from improper preparation or use of such files, the Fair Credit Reporting Act provides for private enforcement of its requirements. 15 U.S.C. §§ 1681n, 1681o (1970). "The general purpose of the FCRA is to protect the reputation of a consumer, for once false rumors are circulated there is not complete vindication. See O. Holmes, The Common Law III (M. Howe ed. 1963)." *Ackerley v. Credit Bureau of Sheridan, Inc.*, 385 F. Supp. 658, 659 (D. Wyo. 1974).

 The threshold question presented is the scope of the Fair Credit Reporting Act. There is no dispute that appellant is a "consumer reporting agency" to which the act applies. *See* 15 U.S.C. § 1681a(f) (1970); *Hoke v. Retail Credit Corp.*, 521 F.2d 1079, 1081 (4th Cir. 1975). However, appellant contends that the November 8 report was not a "consumer report" within the meaning of section 1681a(d) because respondent learned of the inaccurate report only

when her application for business-related insurance was denied. In view of the clear language of the statute, decisions applying this provision, and administrative interpretation under the act, we conclude that the protections of the act are fully applicable to the November 8 investigatory report.

A "consumer report" is defined as follows:

> any written, oral, or other communication of any information by a consumer reporting agency . . . which is *used or expected to be used or collected in whole or in part* for the purpose of serving as a factor in establishing the consumer's eligibility for (1) credit or insurance to be used primarily for personal, family, or household purposes . . .

(Italics ours.) 15 U.S.C. § 1681a(d) (1970). Words used in a statute are to be given their ordinary meaning in the absence of persuasive reasons to the contrary. *Burns v. Alcala*, 420 U.S. 575, 580-81, 43 L. Ed. 2d 469, 95 S. Ct. 1180 (1975); *State v. Jones*, 84 Wn.2d 823, 830, 529 P.2d 1040 (1974). Where the language of a provision is clear, the words employed are to be considered the final expression of legislative intent. *Federal Trade Comm'n v. Manager, Retail Credit Co.*, 515 F.2d 988, 995 n.14 (D.C. Cir. 1975); *Canteen Serv., Inc. v. State*, 83 Wn.2d 761, 763, 522 P.2d 847 (1974). The November 8 report prepared by appellant contained information "used . . . expected to be used [and] collected" for the purpose of establishing respondent's eligibility for "insurance to be used primarily for personal . . . purposes." That report was prepared in connection with respondent's application for health insurance. It was not then associated with any business purpose of respondent. Appellant conducted no new investigation in connection with respondent's application for life insurance needed to obtain the Small Business Administration loan, but simply submitted the November 8 report.

This conclusion finds support in several federal cases giving a broad interpretation to the statutory term. In *Belshaw v. Credit Bureau of Prescott*, 392 F. Supp. 1356, 1359-60 (D. Ariz. 1975), the court held that " 'consumer report'

must be interpreted to mean any report made by a credit reporting agency of information *that could be used* for one of the purposes enumerated in § 1681a."

> The Act cannot be interpreted as applicable to the activities of credit reporting agencies only when the consumer applies for credit, insurance, or employment, leaving them otherwise free to continue the very practices the Act was designed to prohibit. The Act would afford little protection for the privacy of a consumer if it only regulated credit reporting agencies in the area of their legitimate business activities but left them free to continue their clandestine activities in other areas.

*Belshaw v. Credit Bureau of Prescott, supra* at 1359. Similarly, in other cases it has been held that information about a consumer which a reporting agency knows or expects will be used "in connection with a business transaction involving the consumer", *see* section 1681b(3)(E), is a "consumer report" under the act. *Greenway v. Information Dynamics, Ltd.*, 399 F. Supp. 1092, 1095 (D. Ariz. 1974); *Beresh v. Retail Credit Co.*, 358 F. Supp. 260 (C.D. Cal. 1973). Other decisions construing section 1681a(d) are distinguishable from the present case on their facts. *Wrigley v. Dun & Bradstreet, Inc.*, 375 F. Supp. 969 (N.D. Ga. 1974) (credit report issued on construction company in connection with extension of commercial credit only); *Sizemore v. Bambi Leasing Corp.*, 360 F. Supp. 252 (N.D. Ga. 1973) (plaintiff conceded that the purpose of application was to secure commercial as opposed to personal credit); *Fernandez v. Retail Credit Co.*, 349 F. Supp. 652 (E.D. La. 1972) (application for insurance required for business loan named corporation as beneficiary).

In addition, administrative interpretation of the term "consumer report" makes it clear that the character of such a report may not be changed by its subsequent use for business purposes. The Federal Trade Commission, charged with enforcement of the Fair Credit Reporting Act, section 1681s, has given the following guidance with respect to this matter:

1. *Question*: Is a report on an individual obtained in

connection with the extension of BUSINESS CREDIT or writing of business insurance a "consumer report"?

*Answer*: No. . . . if a report is obtained on an individual for the purpose of determining his eligibility for business credit or insurance, it is not a "consumer report".

However, when the information contained in the report was *originally collected in whole or in part for consumer purposes, it is a consumer report* and it may not be subsequently furnished in a business credit or business insurance report.

(Italics ours.) F.T.C., *Compliance with the Fair Credit Reporting Act* (2d ed. May 7, 1973), 5 CCH Consumer Credit Guide ¶ 11,314, at 59,815.

A business credit or business insurance report on an individual would be exempt from the Act provided that the information contained in the report was specifically collected for that purpose. *However, if the information was originally collected for consumer purposes and then was subsequently used in a business credit or business insurance report, then such a report would become a consumer report as defined in the Act.*

We make this distinction because certain large consumer reporting agencies have a substantial quantity of information on individuals which was originally collected for consumer purposes. Congress in passing the legislation did not intend for this information to be used in business reports without being subject to the protective provisions of the Act.

(Italics ours.) [1969-1973 Transfer Binder] CCH Consumer Credit Guide ¶ 99,424, at 89,384-85. (Excerpt from FTC Informal Staff Opinion Letter of May 19, 1971, by Joseph Martin, Jr., General Counsel and Congressional Liaison Officer.)

■ Courts show great deference to the interpretation given a statute by the officers of agency charged with its administration, particularly when the construction is by persons " 'charged with the responsibility of setting its machinery in motion, of making the parts work efficiently and smoothly while they are yet untried and new.' " *Udall v. Tallman*, 380 U.S. 1, 16, 13 L. Ed. 2d 616, 85 S. Ct. 792

(1965). *See Red Lion Broadcasting Co. v. FCC*, 395 U.S. 367, 381, 23 L. Ed. 2d 371, 89 S. Ct. 1794 (1969); *Hama Hama Co. v. Shorelines Hearings Bd.*, 85 Wn.2d 441, 448, 536 P.2d 157 (1975). Thus, we hold that the November 8 report prepared by appellant was a "consumer report" entitled to the protections of the Fair Credit Reporting Act.

## II

Appellant argues the trial court erred in instructing the jury with respect to damages allowable under the Fair Credit Reporting Act. The pertinent instruction stated in part:

> These damages are such as afford fair and reasonable compensation to the plaintiff for the actual injury which the plaintiff has sustained to her general reputation and good name in the community where known, and for any injury which she has sustained by way of injuries to her feelings or to her credit standing, or any loss of income naturally resulting from such statements published by the defendant.
>
> . . .
>
> In determining to what extent a wom[a]n's reputation may have been injured by alleged violation of the act, you must first determine from the evidence what the reputation of the plaintiff was, as to the trait of character affected by such statement complained of, before the statement was made, and then determine to what extent such reputation was injured.
>
> . . . In assessing the plaintiff's damages, you will take into consideration the mental suffering, if any, produced by such violation of the act.
>
> You may further make such allowance for loss of credit standing or financial loss, if any, as the evidence establishes to a reasonable certainty was sustained by the plaintiff as a natural consequence of the alleged violation of the act.

In essence, appellant contends that damages recoverable under the act are limited to out-of-pocket losses and do not include harm to reputation, injury to feelings, or mental suffering.

Upon a showing of negligent noncompliance with its requirements, alleged by respondent here, *see* sections 1681o,

1681e(b), the act provides for the recovery of "an amount equal to . . . any actual damages sustained by the consumer as a result of the failure" of the reporting agency to comply.[2] 15 U.S.C. § 1681o (1970); *see* 15 U.S.C. § 1681n (1970). The legislative history of the act contains no indication of the scope of the term "actual damages." *See* S. Rep. No. 517, 91st Cong., 1st Sess. (1969); Conf. Rep. 1587, 91st Cong., 2d Sess. (1970); 115 Cong. Rec. 33404-13 (1969); 116 Cong. Rec. 6200-01 (1970); 117 Cong. Rec. 35847-51 (1970); 117 Cong. Rec. 35937-43 (1970); 117 Cong. Rec. 36569-77 (1970); *see generally* McNamara, *The Fair Credit Reporting Act: A Legislative Overview*, 22 J. Pub. L. 67 (1973). To date, the term "actual damages" in the Fair Credit Reporting Act has been construed by two federal courts and both decisions support the trial court's instruction in the present case. In *Millstone v. O'Hanlon Reports, Inc.*, 383 F. Supp. 269, 276 (E.D. Mo. 1974), the court found that although the consumer did not lose wages or incur medical expenses as a result of the noncompliance of the reporting agency, he was actually damaged in the amount of $2,500 "by reason of his mental anguish and . . . symptoms of sleeplessness and nervousness" and by having to contact the agency and leave his employment to meet with the agency on numerous occasions. *Johnson v. Credit Bureau of Nashville, Inc.*, appeal docketed, No. 74-347-NA-CV (M.D. Tenn., Dec. 5, 1975), relied upon by appellant, is consistent with *Millstone*. *Johnson* was based solely on the lack of proof of any injury to the consumer. The court implied that harm to reputation would be compensable under the Fair Credit Reporting Act in proper circumstances, stating "[p]laintiffs' bare conclusory allegation that their reputation was injured is insufficient, without more, to establish *actual* damage. Plaintiffs offered no compelling proof at

---

[2]We note the court in *Ackerley v. Credit Bureau of Sheridan, Inc.*, 385 F. Supp. 658, 661 (D. Wyo. 1974), stated "actual damage is not required in an action to enforce any liability under the [Fair Credit Reporting] Act. [Section 168ln] does not speak in terms of requiring actual damages; rather, it refers to actual damages as only one portion of any award or relief that might be granted."

trial of any demonstrable damage in this regard." *Johnson v. Credit Bureau of Nashville, Inc., supra. See Miller v. Credit Bureau, Inc.,* (D.C. Super. Ct. 1972), [1969-1973 Transfer Binder] CCH Consumer Credit Guide ¶ 99,173 at 89,067-70.

Appellant argues that the term "actual damages" was chosen by Congress as part of a formula to limit the liability of credit reporting agencies to damages less than those available under common-law libel rules. It is true that the Fair Credit Reporting Act embodies some limitation on liability, but it does not restrict a consumer's recovery as severely as appellant contends. The act precludes consumer actions "in the nature of defamation" based on information disclosed under the act "except as to false information furnished with malice or willful intent to injure such consumer." 15 U.S.C. § 1681h(e) (1970). This provision suggests no more than that Congress intended to restrict the availability of defamation actions and the recovery of defamation damages. However, the trial court's instruction in this case did not contravene the letter or spirit of section 1681h(e) since it was *not* an instruction on libel damages. The striking characteristic of common-law libel damages is not that recovery is allowed for injury to reputation but that such injury is often *presumed. See, e.g., Amsbury v. Cowles Publishing Co.,* 76 Wn.2d 733, 737, 458 P.2d 882 (1969); *Arnold v. National Union of Marine Cooks & Stewards,* 44 Wn.2d 183, 187, 265 P.2d 1051 (1954); D. Dobbs, *Handbook on the Law of Remedies* § 7.2 (1973). As stated by the United States Supreme Court in *Gertz v. Robert Welch, Inc.,* 418 U.S. 323, 349, 41 L. Ed. 2d 789, 94 S. Ct. 2997 (1974):

> The common law of defamation is an oddity of tort law, for it allows recovery of purportedly compensatory damages without evidence of actual loss. Under the traditional rules pertaining to actions for libel, the existence of injury is presumed from the fact of publication. Juries may award substantial sums as compensation for sup-

posed damage to reputation without any proof that such harm actually occurred.

The trial court's instruction in the present case specifically referred to compensation only for "actual injury," did not suggest that harm was presumed to flow from appellant's acts, and thus did not misapply the "actual damages" language of section 1681o in this respect.

The trial court's instruction on damages did state, "[t]he reputation of the plaintiff is presumed to have been good at the time any alleged violation of the act occurred, until the contrary has been established by the evidence." However, this statement does not refer to presumed *injury*, that element of recovery which section 1681h(e) was designed to eliminate in actions under the statute. It has reference only to a condition against which injury to reputation may be measured. This portion of the instruction, then, is also consistent with the act.

Moreover, the limitation of libel recovery embodied in section 1681h(e) does not suggest that "actual damages" under the Fair Credit Reporting Act are limited to out-of-pocket losses. We agree with the reasoning of Justice Tobriner in *Weaver v. Bank of America Nat'l Trust & Sav. Ass'n*, 59 Cal. 2d 428, 380 P.2d 644, 30 Cal. Rptr. 4 (1963), where the court construed a statute restricting a drawer's recovery following wrongful dishonor by a bank to "actual damages." After reviewing the history of the statute, the court stated, at page 437, "[a]ssuming the purpose of the statute to be the repeal of the common-law presumption of damages, such purpose would not be thwarted by recognition of compensatory damages for actual loss of reputation and impairment of health." *See also Levy v. Fleischner*, 12 Wash. 15, 17-18, 40 P. 384 (1895). Similarly, the intent of Congress in framing the Fair Credit Reporting Act was simply to limit recovery for presumed injury to instances of "malice and willful intent" *and* to allow a fully compensatory award for actual injury in other cases of noncompliance with the act. The two objectives are compatible. The structure of the statute in no way suggests an intent to

limit recovery to pecuniary or out-of-pocket losses. A contrary conclusion would diminish much of the effectiveness of this remedial legislation. *See Tcherepnin v. Knight*, 389 U.S. 332, 336, 19 L. Ed. 2d 564, 88 S. Ct. 548 (1967); *Roza Irrigation Dist. v. State*, 80 Wn.2d 633, 639, 497 P.2d 166 (1972).

In reference to the type of harm suffered, the term "actual damages" has a generally accepted legal meaning. Although it declined to define "actual injury," the United States Supreme Court recently noted the variety of harm which may result when damage is actually sustained.

> Suffice it to say that actual injury is not limited to out-of-pocket loss. Indeed, the *more customary types of actual harm* inflicted by defamatory falsehood *include impairment of reputation and standing in the community, personal humiliation, and mental anguish and suffering.* Of course, juries must be limited by appropriate instructions, and all awards must be supported by competent evidence concerning the injury, although there need be no evidence which assigns an actual dollar value to the injury.

(Italics ours.) *Gertz v. Robert Welch, Inc., supra* at 350. *Accord, Weaver v. Bank of America Nat'l Trust & Sav. Ass'n, supra; Anderson v. Pantages Theatre Co.*, 114 Wash. 24, 31, 194 P. 813 (1921). It is important to note that although *Gertz* was a defamation action, it is clear that the court's language is not limited to such cases. There is, therefore, no conflict with the restriction on libel actions in section 1681e(h). The statement quoted above describes a limitation on state remedies, *in the form of the elimination of presumed damages*, where knowledge of falsity or reckless disregard for truth was absent. *Gertz v. Robert Welch, Inc., supra* at 349-50; *see Taskett v. KING Broadcasting Co.*, 86 Wn.2d 439, 447, 546 P.2d 81 (1976). The broad applicability of the language was suggested by the Supreme Court itself when, referring to "actual injury," it noted that "trial courts have wide experience in framing appropriate jury instructions in tort actions." *Gertz v. Robert Welch, Inc., supra* at 350. Violations of the Fair Credit Reporting Act

have been characterized as having a "tortious nature." *Ackerley v. Credit Bureau of Sheridan, Inc.*, 385 F. Supp. 658, 661 (D. Wyo. 1974). The court's language is merely descriptive of the type of actual damage likely to flow from the dissemination of false information about a person, as was alleged in the present case. A familiar legal term used in a statute is given its familiar legal meaning. *Bradley v. United States*, 410 U.S. 605, 609, 35 L. Ed. 2d 528, 93 S. Ct. 1151 (1973); *New York Life Ins. Co. v. Jones*, 86 Wn.2d 44, 47, 541 P.2d 989 (1975). The construction of section 1681o embodied in the trial court's damage instruction is consistent with the generally accepted meaning of the term "actual damages" described by the United States Supreme Court in *Gertz*.[3] For these reasons, we hold that "actual damages" under the Fair Credit Reporting Act are not limited to out-of-pocket losses, but encompass all the elements of compensatory awards generally, including those stated in the trial court's instruction in the present case.

■■ We recognize, as stated in *Gertz v. Robert Welch, Inc., supra* at 350, that "all awards must be supported by competent evidence". In this case, respondent testified that as a consequence of the November 8 report her insurance premiums were increased, that the Small Business Administration loan was delayed, that time and expense were

---

[3]The term "actual damages" is also used to denote the type of damage award as well as the nature of injury for which recovery is allowed. In this sense, the term has a second, consonant, and established meaning. " 'Actual' damages are synonymous with compensatory damages." *Weider v. Hoffman*, 238 F. Supp. 437, 445 (M.D. Pa. 1965); *accord, United States v. State Road Dep't*, 189 F.2d 591, 596 (5th Cir. 1951); *see* 22 Am. Jur. 2d *Damages* § 11 (1965); 1 *Damages* § 2.1 (Oregon State Bar CLE, 1973); *cf. Estate Counseling Serv., Inc. v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 303 F.2d 527, 533 (10th Cir. 1962) (securities act violation); *Schaefer v. First Nat'l Bank*, 326 F. Supp. 1186, 1193 (N.D. Ill. 1970) (securities act violation); *United States v. Russell Elec. Co.*, 250 F. Supp. 2, 24 (S.D.N.Y. 1965) (liability for "excess costs"). Thus, actual damages, flowing from injury in fact, are to be distinguished from damages which are "nominal," "exemplary" or "punitive." See D. Dobbs, *Handbook on the Law of Remedies* §§ 3.1, 3.8 (1973); C. McCormick, *Handbook on the Law of Damages* §§ 20, 21, 77 (1935). The trial court's instruction properly provided for such a compensatory award.

expended in resolving the dispute with appellant, that the report damaged her personally and in her business reputation in the small community, and that she suffered emotionally from the experience. Much of this testimony was undisputed. An employee in appellant's Spokane office confirmed that respondent became upset when informed of the contents of the November 8 report. While we acknowledge that such evidence of "actual damages" is not overwhelming, we find it sufficient to support the amount awarded by the jury here. "The amount of damages was a matter within the discretion of the jury. Neither the trial court nor any appellate court should substitute its judgment for that of the jury as to the amount of damages." *Cowan v. Jensen*, 79 Wn.2d 844, 847, 490 P.2d 436 (1971); *see Adams v. State*, 71 Wn.2d 414, 432, 429 P.2d 109 (1967). The fact that the court would have assessed a smaller or larger amount than the jury is not a ground to interfere with the verdict. *Workman v. Marshall*, 68 Wn.2d 578, 582, 414 P.2d 625 (1966). This court will not disturb an award of damages made by a jury unless it is outside the range of substantial evidence in the record, or shocks our conscience, or appears to have been arrived at as the result of passion or prejudice. *Holdcroft v. Hahn Truck Co.*, 71 Wn.2d 410, 413, 429 P.2d 204 (1967); *Mitchell v. Lantry*, 69 Wn.2d 796, 798, 420 P.2d 345 (1966). No such ground for reversal exists in the present case. Moreover, we emphasize that in instances of injury to reputation, personal humiliation, mental suffering, and similar harm "there need be no evidence which assigns an actual dollar value to the injury." *Gertz v. Robert Welch, Inc., supra* at 350. " 'The subject matter being difficult of proof, [the amount of damages] cannot be fixed with mathematical certainty by the proof.' " *Adams v. State, supra* at 432; *see Jacqueline's Washington, Inc. v. Mercantile Stores Co.*, 80 Wn.2d 784, 786, 498 P.2d 870 (1972).

## III

■ In support of its motion for a new trial, appellant submitted affidavits of two jurors representing that some

members of the jury failed to follow one of the trial court's instructions. The trial court declined to consider such allegations of misconduct and denied the motion. It did not err in so doing. While appellant's argument is considerably more detailed and vigorous than we have set out, it is governed by the rule in this jurisdiction that allegations of jury misconduct which "inhere in the verdict" may not be considered by the court. *Gardner v. Malone*, 60 Wn.2d 836, 841, 376 P.2d 651 (1962); *see State v. Gay*, 82 Wash. 423, 439, 144 P. 711 (1914). We have stated the fact that " 'one or more jurors *misunderstood* the judge's *instruction*' " does inhere in the verdict. *Gardner v. Malone, supra* at 841; *State v. Gobin*, 73 Wn.2d 206, 211, 437 P.2d 389 (1968); *State v. McKenzie*, 56 Wn.2d 897, 355 P.2d 834 (1960); *Ralton v. Sherwood Logging Co.*, 54 Wash. 254, 103 P.28 (1909). "[A] juror may not divulge what considerations entered into his deliberations or controlled his actions in arriving at a verdict." *Coleman v. George*, 62 Wn.2d 840, 842, 384 P.2d 871 (1963). *See Hendrickson v. Konopaski*, 14 Wn. App. 390, 393-94, 541 P.2d 1001 (1975). The facts of this case do not take it outside our general rule.

Appellant further contends that four statements by respondent's counsel during closing argument constitute reversible misconduct. However, objections were sustained to each remark and counsel withdrew one comment. The statements were not so prejudicial as to require reversal. *Nelson v. Mueller*, 85 Wn.2d 234, 236, 533 P.2d 383 (1975). Even had they been sufficiently prejudicial, appellant failed to request a corrective instruction and, therefore, did not preserve its claim of error with respect to such statements. *See, e.g., Strandberg v. Northern Pac. Ry.*, 59 Wn.2d 259, 264, 367 P.2d 137 (1961); *Seth v. Department of Labor & Indus.*, 21 Wn.2d 691, 694, 152 P.2d 976 (1944); *Canfield v. Seattle Cornice Works*, 122 Wash. 318, 322, 210 P. 773 (1922).

### IV

■ Appellant assigns error to the instruction of the trial court which quoted section 1681g as to disclosure re-

quirements under the Fair Credit Reporting Act. Error in giving an instruction does not justify granting a new trial unless the appellant can establish he was prejudiced thereby and the error affected the jury's conclusion. *Nelson v. Mueller*, 85 Wn.2d 234, 236, 533 P.2d 383 (1975). While there was insufficient evidence to indicate a violation of these statutory duties by appellant, here, as in *Cameron v. Boone*, 62 Wn.2d 420, 423, 383 P.2d 277 (1963), "the instruction was not prejudicial . . . [since] the evidence, which was uncontroverted, supported a finding of full compliance by appellant with this duty . . . it is difficult to conceive of confusion." *See Kelley v. Great Northern Ry.*, 59 Wn.2d 894, 904-05, 371 P.2d 528 (1962); *Schmitz v. Mathews*, 141 Wash. 278, 279-80, 251 P. 571 (1926). Other challenged instructions are either accurate statements of the law, supported by substantial evidence, or not properly before this court on appeal because inadequate exceptions were taken. *See Haslund v. Seattle*, 86 Wn.2d 607, 547 P.2d 1221 (1976); *Nelson v. Mueller*, *supra* at 237-38.

Furthermore, the evidentiary rulings contested by appellant do not constitute grounds for reversal. Each of the rulings was within the discretion of the trial court and there was no abuse of that discretion. *See, e.g., Zillah Feed Yards, Inc. v. Carlisle*, 72 Wn.2d 240, 244, 432 P.2d 650 (1967) (business records); *Jacobs v. Brock*, 73 Wn.2d 234, 238, 437 P.2d 920 (1968) (relevancy); *Coleman v. Dennis*, 1 Wn. App. 299, 302, 461 P.2d 552 (1969) (remoteness).

■ Finally, appellant maintains that the trial court erred in failing to grant its motions for a directed verdict and judgment notwithstanding the verdict inasmuch as the truth of the November 8 report was proved to a point where reasonable persons could not disagree as to its accuracy. It is well established that a challenge to the sufficiency of the evidence in the form of either of these motions admits, for purposes of the motion, the truth of the nonmoving party's evidence and all reasonable inferences drawn therefrom. *Moyer v. Clark*, 75 Wn.2d 800, 803, 454 P.2d 374 (1969). In ruling on such a motion, the evidence

must be considered in a light most favorable to the non-moving party, there is no element of discretion vested in the trial court, and the motion shall be granted only in those instances where it can be held as a matter of law that there is no competent evidence, nor reasonable inferences, which would sustain a jury verdict in favor of the nonmoving party. *Shelby v. Keck*, 85 Wn.2d 911, 913, 541 P.2d 365 (1975). If there are justifiable inferences from the evidence upon which reasonable minds might reach conclusions that would sustain the verdict, then the question is for the jury, not for the court. *Moyer v. Clark, supra* at 803.

In the present case, there was conflicting evidence as to the accuracy of appellant's investigatory report prepared on respondent. The most disputed portion of the November 8 investigatory report was changed in the second report to conform substantially to respondent's version of the circumstances. In fact, the second report relied on respondent herself as a source for the pertinent information. Moreover, there was a great deal of evidence which contradicted the report's assertion that respondent's reputation had suffered because of her living arrangements. Numerous witnesses, including the manager of a local bank, a previous employer of respondent, the Sandpoint Chief of Police, and longtime neighbors testified that respondent enjoyed a favorable reputation, contrary to the conclusion of the November 8 report. The trial court did not err in denying appellant's motions.

The issues presented in this case do not permit an exhaustive discussion of all facets of the Fair Credit Reporting Act; however, the act has been the subject of extensive commentary discussing the nature of the credit information industry, common-law remedies for consumers, the operation of the federal act and its deficiencies. *See, e.g.*, Feldman, *The Fair Credit Reporting Act—From the Regulator's Vantage Point*, 14 S.C. Lawyer 459 (1974); Koon, *Translating the Fair Credit Reporting Act*, 48 Denver L.J. 51 (1971); Note, *The California Consumer Reporting Agencies Act: A Proposed Improvement on the Fair Credit Report-*

*ing Act,* 26 Hastings L.J. 1219 (1975); Note, *The Fair Credit Reporting Act,* 56 Minn. L. Rev. 819 (1972); Comment, *The Impact of the Fair Credit Reporting Act,* 50 N.C. L. Rev. 852 (1972); Note, *Panacea or Placebo? Actions for Negligent Noncompliance Under the Federal Fair Credit Reporting Act,* 47 S. Cal. L. Rev. 1070 (1974); *Protecting Consumers from Arbitrary, Erroneous, and Malicious Credit Information,* 4 U. Calif. at Davis L. Rev. 403 (1971); Note, *Protecting the Subjects of Credit Reports,* 80 Yale L.J. 1035 (1971); *see also* Annot., 17 A.L.R. Fed. 675 (1973).

Judgment affirmed.

HUNTER, HAMILTON, WRIGHT, BRACHTENBACH, and HOROWITZ, JJ., concur.

STAFFORD, C.J. (concurring in the result only)—I concur only in the result. I cannot accept such an overbroad treatment of "actual damages." The majority has opened new vistas of recovery for damages that are based on purely subjective feelings and complaints.

ROSELLINI, J., concurs with STAFFORD, C.J.

Petition for rehearing denied December 2, 1976.