[No. 31657-9-II.   Division Two.   September 27, 2005.]

THE STATE OF WASHINGTON, *Respondent*, v. LORNE KENNETH ROOTH, *Appellant*.

*Kathryn A. Russell Selk* (of *Russell Selk Law Office*), for appellant.

*Gerald A. Horne, Prosecuting Attorney, Donna Y. Masumoto, Deputy,* and *Shannon Tillar, Legal Intern,* for respondent.

¶1 BRIDGEWATER, J. — Lorne Kenneth Rooth appeals his convictions for first degree unlawful possession of a firearm, attempting to elude with a firearm enhancement, unlawful possession of a controlled substance—marijuana, and third degree driving while license suspended or revoked. We reverse the conviction for unlawful possession of a firearm because the State conceded, and we agree, that there was

insufficient evidence to support a conviction concerning possession of the .22 caliber handgun.

¶2 The State urges us to hold that there was a clerical error in the instructions to the jury that incorrectly referred to the .22 caliber count as count I of the information, when it was charged as count II. The jury returned a verdict of guilty to count II, as charged in the information. The jury found Rooth not guilty of count I as charged in the information; that count concerned the 9 mm handgun, for which there was sufficient evidence of possession. Neither verdict identified the weapon that was charged in the information. The trial court's judgment and sentence may not stand because it sentenced on a conviction of count II. The error was not clerical, but judicial, and cannot be corrected under CrR 7.8. And any attempt to review the intentions of the jury to ascertain if they thought they were acquitting the defendant of unlawful possession of the .22 caliber handgun, not the 9 mm handgun, would be improper because the jury's thought process necessarily inheres in the verdict. We cannot impeach the jury's verdicts and alter either the verdict in count I to guilty or change the verdict in count II to not guilty.

¶3 We hold that there was sufficient evidence for the firearm enhancement to the attempting to elude conviction in that Rooth had actual possession of the firearm during the crime of attempting to elude. We reverse the conviction for unlawful possession of a firearm as charged in count II, we affirm the conviction and firearm enhancement for count III and counts IV and V, and remand for resentencing.

## FACTS

¶4 On July 9, 2003, Officer Travis Kenyon of the Fife Police Department observed a full-size van traveling in the 2500 block of Pacific Highway with a defective license plate light. Officer Kenyon kept pace with the car, eventually activating his emergency lights and attempting to stop the vehicle. The van started to slow but did not immediately stop.

¶5  The van continued on Pacific Highway, approaching the Port of Tacoma. The light was red as the van approached the intersection but the vehicle failed to slow down. The van proceeded through the intersection, cutting off a semitrailer that was halfway through the intersection. At that point, Officer Kenyon turned on his spotlight in addition to his overhead lights and his siren.

¶6  The van then proceeded on to the southbound on-ramp of Interstate 5. The van remained 50 to 75 yards in front of Officer Kenyon. While on the freeway, the van achieved speeds of 60 to 80 miles per hour. The van continued on southbound Interstate 5, not using its signals or making safe lane changes. It also cut off other vehicles that it passed. At times, the van even drove onto the shoulder of the freeway. The van exited the freeway and sped at 50 mph on the city street. The van stopped in an apartment complex and the driver fled while the pursing officer and other officers followed him on foot. Rooth was then apprehended.

¶7  In the area where the officers caught Rooth, they recovered a black compact disc case. The case contained a large amount of money and a baggie of marijuana. After detaining Rooth, the officers searched the van. The van contained a number of miscellaneous items, including a type of bed stuffed in the back, boxes, clothes, toys, and garbage. There was no open space on the floor. The officers found a black bag filled with clothing located two to three feet behind the driver's seat. The bag was open, and the police located a .22 caliber handgun in the bag.

¶8  Sergeant David Woods of the Fife Police Department was also involved with the pursuit of Rooth. After the pursuit ended, Sergeant Woods spoke with the female passenger from the van. She told the officers about a weapon that the driver tossed out of the van during the pursuit. She identified a person other than Rooth as the driver but the officer identified Rooth as the driver. Officers located a 9 mm handgun on the street near where Rooth exited the freeway.

TRIAL

¶9 The State charged Rooth with five separate counts: first degree unlawful possession of a firearm (9 mm handgun), count I; first degree unlawful possession of a firearm (.22 caliber handgun), count II; attempting to elude a pursuing police vehicle while armed with a firearm, count III; third degree driving while license suspended or revoked, count IV; and unlawful possession of a controlled substance—marijuana, count V.

¶10 Before trial, the State moved to exclude Shannon King from testifying. King was a defense witness who had received a telephone call on July 9, 2003, to meet an individual at a local motel. King arrived at the motel and was told by Kevin Grice that he was expecting a phone call. After Grice went to take a shower, the phone rang and King answered it. The person on the phone identified himself as Casper, the individual the woman passenger had said was the driver of the van. King and Casper talked briefly and then she handed the phone to Rooth.

¶11 The State argued that King's testimony was hearsay under ER 801. The court excluded any hearsay testimony that King might offer but ruled that she could testify to the things she had personal knowledge of regarding July 9.

¶12 The State's first witness was Officer Travis Kenyon. The officer discussed his pursuit of Rooth. He related Rooth's driving as he initially entered southbound Interstate 5. As Rooth drove down the acceleration lane, he "recklessly" went around the left side of vehicles in front of him. 1 Report of Proceedings (RP) at 25. That action caused the driver's side wheel and the driver's side back wheel to hit the dirt, and the vehicle started to fishtail, nearly losing control.

¶13 Officer Kenyon further testified that the van was never out of his sight. He stated that he observed the van driving recklessly through traffic and making erratic lane changes. The van did not make careful or safe lane changes and would drive onto the shoulder and then back into the

lanes. The officer described Rooth's driving as "something that nobody would normally do." 1 RP at 30. Officer Kenyon stated that he decided to pull the van over for a traffic infraction but the driver then turned the offense into reckless driving, which was why he decided to pursue the van. He further noted his belief that Rooth was attempting to lose him.

¶14 Additionally, Officer Kenyon testified that the view from his patrol car to the van was unobstructed at the time the van stopped in the apartment complex. He positioned his spotlight in the area of the driver's side mirror and saw Rooth exit the vehicle. He stated he was able to get a good look at Rooth and was able to describe him to his dispatcher. Officer Kenyon also stated that he never witnessed another person coming out of the driver's door nor did he see a passenger exit the van.

¶15 On the second day of trial before the court brought in the jury, the court asked defense counsel whether he was chewing tobacco. Defense counsel responded that he was. The court then stated that a juror had asked whether defense counsel was chewing. Defense counsel told the court that if he did not chew, the jury would be unable to understand what he was saying. The court instructed counsel to remove the tobacco but permitted him to explain his habit to the jury.

¶16 The court then called in the jury. Defense counsel apologized and explained to the jury that he had started chewing tobacco at a young age and that the juices helped to relax his tongue. The court then told the jury that if any juror had a problem understanding a witness or an attorney to raise their hand.

¶17 Ashley Rousey, the passenger in the van, also testified. Rousey did not remember many details from the incident on July 9. She testified she thought it was July 7th when the incident had occurred but she was not sure. Rooth had come over to a mutual friend's apartment. Before Rooth arrived, the group had consumed alcohol and smoked methamphetamine.

¶18 Rousey testified that she left the apartment about an hour after Rooth arrived. She, Rooth, and Casper (another male) left the residence in a van. When questioned, Rousey could not remember what Casper had worn or any details about the inside of the van. Rousey stated that Casper had driven the van.

¶19 Once the group left the apartment, they headed toward Fife. The van stopped at a motel parking lot about 20 minutes later. Seconds after the group left the parking lot, Rousey noticed there was a police officer behind them. Rousey testified that the van quickly entered the freeway after the driver noticed the police officer.

¶20 Rousey stated that the van headed toward Lakewood. She further testified that while driving to Lakewood, Casper handed her a firearm. She held onto the gun until the van reached the 84th Street exit. At that time, Casper asked her to throw the firearm out the window. Rousey stated she refused to throw the firearm out and she handed it back to Casper. She testified that she saw the gun go out her window in the area of 84th and Hosmer on the right side of the street.

¶21 When the van reached 96th and the apartment complex, Rousey testified the van started to stop. Casper opened his door and ran, and Rooth followed him. Casper and Rooth ran through the apartments. Rousey testified that she had wanted to run but could not get her door open.

¶22 The State asked Rousey if she recognized her written statement from that night. Rousey replied that she did. The State then asked if she had included in her statement that Casper had asked her to throw the gun out the window. Rousey responded that her statement did not include that information. On cross-examination, Rooth asked Rousey to read her handwritten statement. Although her statement did not name Casper, it did state that the driver had told her to roll down her window and throw a gun out of the window.

## ANALYSIS

### I. Verdict/Judgment and Sentence

¶23 The State charged Rooth with two counts of first degree unlawful possession of a firearm. Count I charged possession of the 9 mm handgun. Count II charged possession of the .22 caliber handgun. During closing arguments, both the State and Rooth switched the guns, referring to the .22 caliber as charged in count I and the 9 mm as charged in count II. Further, the State conceded in closing argument that it had not presented sufficient evidence for the jury to convict Rooth of possession of the .22 caliber and asked the jury to acquit regarding the .22 caliber. Jury instruction 13, one of the "to-convict" instructions, stated in part:

> To convict the defendant of the crime of Unlawful Possession of a Firearm in the First Degree as charged in Count One, each of the following elements of the crime must be proved beyond a reasonable doubt:
>
> (1) That on or about the 9th day of July, 2003, the defendant knowingly had a firearm, to-wit: a .22 caliber revolver in his possession or control.

Clerk's Papers (CP) at 27.

¶24 Jury Instruction 14 stated in relevant part:

> To convict the defendant of the crime of Unlawful Possession of a Firearm in the First Degree as charged in Count Two, each of the following elements of the crime must be proved beyond a reasonable doubt:
>
> (1) That on or about the 9th day of July, 2003, the defendant knowingly had a firearm, to-wit: a 9 mm semi-automatic pistol, in his possession or control.

CP at 28.

¶25 The jury seemingly returned verdicts acquitting Rooth of unlawful possession of the .22 caliber and finding him guilty of possession of the 9 mm in conformity with the instructions and the closing arguments. But the count I verdict form stated: "We, the jury, find the defendant [n]ot

[g]uilty of the crime of Unlawful Possession of a Firearm in the First Degree *as charged in Count One.*" CP at 44 (emphasis added). The count II verdict form stated: "We, the jury, find the defendant [g]uilty of the crime of Unlawful Possession of a Firearm in the First Degree *as charged in Count Two.*" CP at 45 (emphasis added). The jury verdicts address the information, not the "to convict" instructions or the arguments. Thus, the verdicts do not correspond with either the erroneous closing arguments or the erroneous "to-convict" instructions that incorrectly stated the elements in the information.

¶26 At issue in this case is whether we should affirm a jury verdict based on erroneous "to-convict" instructions. Contrary to the State's assertion, the erroneous jury instructions were not a clerical error. CrR 7.8(a) provides that: "[c]lerical mistakes in judgments, orders or other parts of the record and errors therein arising from oversight or omission may be corrected by the court at any time of its own initiative or on the motion of any party and after such notice, if any, as the court orders."

¶27 To determine whether a clerical error exists under CrR 7.8, we use the same test used to determine clerical error under CR 60(a), the civil rule governing amendment of judgments. *State v. Snapp*, 119 Wn. App. 614, 626, 82 P.3d 252, *review denied*, 152 Wn.2d 1028 (2004). In *Presidential Estates Apartment Associates v. Barrett*, 129 Wn.2d 320, 326, 917 P.2d 100 (1996), the court set forth the review necessary to determine whether an error is clerical or judicial. The court looks at "whether the judgment, as amended, embodies the trial court's intention, as expressed in the record at trial" to determine if the error is clerical. *Presidential*, 129 Wn.2d at 326. If it does, then the amended judgment merely corrects the language to reflect the court's intention or adds the language the court inadvertently omitted. *Presidential*, 129 Wn.2d at 326. If it does not, then the error is judicial and the court cannot amend the judgment and sentence. *Presidential*, 129 Wn.2d at 326.

■ ■ ¶28 Here, the trial court's judgment followed a jury trial, not a bench trial The trial court sentenced according to the jury's verdicts, which the State now alleges were incorrect because of clerical error. Nothing in the record indicates that the trial court intended to sentence in accord with the information but, through some clerical error, it wrongfully sentenced Rooth. Perhaps if the verdict forms had identified the firearm, i.e., the .22 caliber handgun or the 9 mm handgun, there would be a basis to address clerical error. But that is not evident from the record. And "an intentional act of the court, even if in error, cannot be corrected under [CrR 7.8]." *Wilson v. Henkle*, 45 Wn. App. 162, 167, 724 P.2d 1069 (1986). The error in the instructions and the judgment and sentence were judicial errors, not clerical errors.

■ ■ ¶29 Nevertheless, the State cites to *United States v. Stauffer*, 922 F.2d 508, 511 (9th Cir. 1990), wherein the jurors submitted affidavits stating that they had been confused about the numbering of the counts and that they intended to convict on a different count. The Ninth Circuit permitted a correction. *Stauffer*, 922 F.2d at 514.

¶30 To accomplish what the State desires requires that the two verdicts be changed; such a change is referred to as "impeach[ing]" the verdict. *See State v. Ng*, 110 Wn.2d 32, 43, 750 P.2d 632 (1988). But the Ninth Circuit's procedure in *Stauffer* of inquiring into the jury's intent is not permitted in Washington: "The individual or collective thought processes leading to a verdict 'inhere in the verdict' and cannot be used to impeach a jury verdict." *Richards v. Overlake Hosp. Med. Ctr.*, 59 Wn. App. 266, 272, 796 P.2d 737 (1990) (quoting *Ng*, 110 Wn.2d at 43), *review denied*, 116 Wn.2d 1014 (1991).

¶31 Juror motives, the effect the evidence had on the jurors, the weight given to the evidence by particular jurors, and the jurors' intentions and beliefs are all factors inhering in the jury's thought processes in arriving at its verdict and, therefore, inhere in the verdict itself. *Ayers v. Johnson & Johnson Baby Prods. Co.*, 117 Wn.2d 747,

768-69, 818 P.2d 1337 (1991). And any averment that is offered concerning these mental processes is inadmissible to impeach the verdict. *Ayers*, 117 Wn.2d at 769. Therefore, any evidence that a juror misunderstood or failed to follow the court's instructions inheres in the verdict and may not be considered. *Ayers*, 117 Wn.2d at 769.

¶32 Accordingly, the verdicts here cannot be impeached. They must stand and be examined and measured by the information. The jury acquitted Rooth of count I, possession of the 9 mm handgun.

■ ¶33 A question remains as to the sufficiency of the evidence as to count II, which charged possession of the .22 caliber handgun. The State conceded, and we agree and hold, that there was insufficient evidence to convict concerning possession of that firearm.[1] The firearm was in a bag well behind the driver, immersed in clutter. Therefore, the guilty verdict on count II must be reversed.

¶34 The only remaining question is whether count III can stand. That is, because the jury found Rooth not guilty of possession of the 9 mm in count I, could it add an enhancement to count III that requires possession of the 9 mm firearm while attempting to elude? Those verdicts are inconsistent.

■ ¶35 Although neither party addresses this issue, the erroneous jury instructions resulted in inconsistent verdicts regarding counts I and III. Washington has adopted the rule set out in *Dunn v. United States*, 284 U.S. 390, 52 S. Ct. 189, 76 L. Ed. 356 (1932), for dealing with inconsistent verdicts. Our Supreme Court noted in *Ng* that the *Dunn* rule establishes " 'the unreviewable power of a jury to return a verdict of not guilty for impermissible reasons.' " *Ng*, 110 Wn.2d at 48 (quoting *United States v. Powell*, 469 U.S. 57, 63, 105 S. Ct. 471, 83 L. Ed. 2d 461 (1984)). The court reaffirmed the rule that inconsistent jury verdicts are

---

[1] It is puzzling that in light of its concession, the State nevertheless proceeded to ask the jury to return a not guilty verdict on the .22 caliber handgun possession charge rather than merely dismissing the count for which there was insufficient evidence.

to be harmonized and upheld whenever possible, acknowledging that such inconsistencies may result from jury mistake, compromise, or lenity. *Ng*, 110 Wn.2d at 48. Thus, the verdict can stand if there was sufficient evidence to uphold the requirement.

II. Evidence Sufficient to Support Weapon Enhancement

¶36 Rooth argues there was insufficient evidence to support the firearm enhancement conviction. Rooth is incorrect.

¶37 This court determines the sufficiency of the evidence by deciding whether, after viewing the evidence in the light most favorable to the State, any rational trier of fact could have found guilt beyond a reasonable doubt. *State v. Green*, 94 Wn.2d 216, 220-22, 616 P.2d 628 (1980). When a defendant challenges the sufficiency of the evidence, he admits the truth of the State's evidence and all inferences that may be reasonably drawn from the evidence. *State v. Salinas*, 119 Wn.2d 192, 201, 829 P.2d 1068 (1992). This court defers to the fact finder's resolution of conflicting testimony, witness credibility, and persuasiveness of the evidence. *State v. Camarillo*, 115 Wn.2d 60, 71, 794 P.2d 850 (1990).

¶38 Rooth urges us to examine the nexus requirement under *State v. Schelin*, 147 Wn.2d 562, 575-76, 55 P.3d 632 (2002). *Schelin* held that for purposes of a sentencing enhancement, a defendant is "armed" when he is within "proximity of an easily and readily available deadly weapon for offensive or defensive purposes and when a nexus is established between the defendant, the weapon, and the crime." *Schelin*, 147 Wn.2d at 575-76. Rooth does not dispute that the police recovered a gun. Rather, he asserts that we must determine if the facts are sufficient, as a matter of law, to prove that he was armed.

¶39 We have recently held that "the State need not prove a nexus between the defendant, the weapon, and the crime when the defendant actually possesses the firearm."

*State v. Easterlin*, 126 Wn. App. 170, 174, 107 P.3d 773 (2005). Here, the officer's testimony supported a finding that Rooth was the driver of the eluding vehicle; and Rousey's statement was to the effect that the driver was in actual possession of the firearm during the elude, both by handing it to her and then by throwing it out the van window. Thus, the evidence was sufficient to support the firearm enhancement verdict.

¶40 A majority of the panel having determined that only the foregoing portion of this opinion will be printed in the Washington Appellate Reports and that the remainder shall be filed for public record pursuant to RCW 2.06.040, it is so ordered.

VAN DEREN, A.C.J., and HUNT, J., concur.